IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
October 3, 2018 Session

## ABU-ALI ABDUR'RAHMAN ET AL. v. TONY PARKER ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 18-183-III    Ellen H. Lyle, Chancellor**

_____

### No. M2018-01385-SC-RDO-CV

_____

SHARON G. LEE, J., dissenting.

The Petitioners, who have been sentenced to death, contend that the State's recently adopted lethal injection protocol violates their federal and state constitutional rights to be free from cruel and unusual punishment. On this important issue, the Petitioners are entitled to a fair and meaningful opportunity to be heard at trial and on appeal without regard to 1) the constitutionality of other lethal injection protocols the State has no plans to use; 2) the execution dates previously set by this Court for Petitioners Billy Ray Irick (already executed), Edmund Zagorksi, and David Earl Miller;[1] and 3) the length of the Petitioners' briefs or the extra minutes granted for oral argument.

The constitutionality of the State's current lethal injection protocol is a complicated issue, involving extensive expert testimony. Several factors, over which the Petitioners had little or no control, combined to deprive them of a fundamentally fair process. One significant factor is the Court's unfortunate rush to execute based on the perceived need to end this case before the executions of Petitioners Irick, Zagorski, and Miller. With the stroke of a pen and in the interest of fairness and justice, the Court could have reset these executions.

_____

[1] Zagorski is set to be executed on October 11, 2018, and Miller on December 6, 2018. Irick was executed on August 9, 2018, after this Court and the United States Supreme Court denied him a stay of execution. *See Irick v. Tennessee*, 585 U.S. ___, ___ (2018) (Sotomayor, J., dissenting) ("In refusing to grant Irick a stay, the Court today turns a blind eye to a proven likelihood that the State of Tennessee is on the verge of inflicting several minutes of torturous pain on an inmate in its custody, while shrouding his suffering behind a veneer of paralysis. I cannot in good conscience join in this 'rush to execute' without first seeking every assurance that our precedent permits such a result. No. M1987-00131-SC-DPE-DD (Lee, J., dissenting), at 1. If the law permits this execution to go forward in spite of the horrific final minutes that Irick may well experience, then we have stopped being a civilized nation and accepted barbarism.").

By putting this case on a rocket docket, the Court denied the Petitioners a fair and meaningful opportunity to be heard and jeopardized the public's confidence and trust in the impartiality and integrity of the judicial system. Today, the Court meets its self-imposed deadline by deciding this case before Zagorski's October 11 execution and Miller's December 6 execution—but at great cost. I cannot go along with the Court's decision because these proceedings have not been fundamentally fair to the Petitioners.

I.

For many years, the State's lethal injection protocol has been a moving target, with the Tennessee Department of Correction frequently changing its lethal injection protocols. On January 8, 2018, the Department adopted a new lethal injection protocol consisting of two options: 1) Protocol A, using compounded pentobarbital; 2) Protocol B, using midazolam, vecuronium bromide, and potassium chloride. Ten days after the Department announced these protocols, this Court set Irick's execution date for August 9, 2018.[2]

On February 20, 2018, the Petitioners filed a declaratory judgment action in the trial court, challenging the constitutionality of Protocol B, the new midazolam-based protocol. The Petitioners claimed that the midazolam-based protocol would cause them to suffer intolerable pain and that execution by Protocol A, pentobarbital, was an available, less painful execution alternative. The Petitioners, at the close of proof, moved to amend their pleadings to conform to the evidence to allege that a two-drug cocktail of midazolam and potassium chloride was an alternative method of execution. The trial court denied this request.

The Petitioners faced a steep uphill battle in their efforts to have the midazolam-based protocol declared unconstitutional. Their obstacles, which ultimately proved insurmountable, included 1) inconsistent and unworkable requirements imposed by *Glossip v. Gross*, 135 S. Ct. 2726 (2015) and the cloak of secrecy regarding Tennessee executions; 2) the extraordinary and unnecessary time constraints imposed by this Court; and 3) the State's evasiveness and last-minute decision about its lethal injection protocol.

To begin with, *Glossip*, a split 5-4 decision by the United States Supreme Court, required the Petitioners to prove 1) that the State's execution protocol was likely to cause an intolerable risk of severe pain or needless suffering, *and* 2) an alternative feasible, readily implemented, available method of execution that would significantly reduce a substantial risk of severe pain. *Glossip*, 135 S. Ct. at 2736–37 (quoting *Baze v. Rees*, 553 U.S. 35, 50, 52 (2008)). The Petitioners presented expert testimony that the State's execution protocol of midazolam, vecuronium bromide, and potassium chloride will cause the inmate being executed to feel severe pain and terror. This is because midazolam

_____

[2] On March 15, 2018, the Court set the execution dates for Zagorski and Miller.

has no analgesic effects and will not render the inmate insensate to pain; vecuronium bromide causes great anxiety, noxious stimulus, paralysis, and the feeling of suffocation—all "quite horrific"—and potassium chloride, which stops the heart, causes the inmate to have very painful feelings of burning upon injection.

Despite this evidence, the trial court dismissed the Petitioners' case because they failed to prove the second *Glossip* prong of an available alternative execution method that would have reduced a substantial risk of severe pain. This *Glossip* requirement has been aptly described as "perverse"[3] because it replaces the Eighth Amendment's categorical prohibition against cruel and unusual punishment with a conditional one.[4] Thus, under *Glossip*, even if the Petitioners establish that the State's execution method will cause them to experience needless suffering or intolerable pain, the State may still carry out the execution *unless* the Petitioners also prove an available alternative method for their own executions.

Considering the Eighth Amendment's clear prohibition on "cruel and unusual punishments," the focus here should have been on whether the Petitioners proved that the State's execution method was likely to cause needless suffering and pain. Yet the Petitioners' claims and evidence of intolerable pain and torture were not the basis of the trial court's decision and thus not reviewed on appeal.

Not only is *Glossip*'s available alternative requirement perverse, it is also unworkable. In Tennessee, executions are cloaked in secrecy, which makes it difficult—if not impossible—for the Petitioners to establish an available alternative to the State's method of execution. Tennessee Code Annotated section 10-7-504(h) (Supp. 2017) protects the identity of individuals or entities directly involved in the execution process. The trial court here prohibited identification of the Department's agents who were involved in procuring execution drugs, such as pentobarbital, and of its potential suppliers.

In addition to the heavy burden imposed by *Glossip* and the cloak of secrecy surrounding executions, the Petitioners were operating under extraordinary time constraints because of the Court's scheduling of Irick's execution on August 9. After the Petitioners filed their challenge, the starting pistol was fired and the race to execute began. The trial court had to fast-track the case so that the parties could present their evidence and the trial court could prepare and file findings of fact, conclusions of law, and its decision before the August execution date. The trial court set the trial to begin on July 9, 2018, giving the parties less than five months to effectively conduct written discovery, litigate discovery disputes, take discovery depositions, locate and retain expert

---

[3] *McGehee v. Hutchinson*, 137 S. Ct. 1275, 1276 (2017) (Sotomayor, J., dissenting).

[4] *See Glossip*, 135 S. Ct. at 2793 (Sotomayor, J., dissenting).

3

witnesses, research legal issues, file trial briefs, and prepare for trial. The discovery schedule was so compressed that the trial court eliminated summary judgment as an option because the Petitioners lacked the time to complete discovery *and* respond to a motion for summary judgment. Sufficient time for investigation, research, and discovery was out of the question because of the looming execution date.

The rush to execute here is in stark contrast to the measured way previous challenges to the State's lethal injection protocols have been handled. This case was pending in the trial court only 156 days. Yet the 2002 challenge to the State's protocol using sodium pentothal, pancuronium bromide, and potassium chloride took twice as long. It was pending in the trial court for 311 days.[5] *See Abdur'Rahman v. Bredesen*, 181 S.W.3d 292 (Tenn. 2005), *cert. denied*, 547 U.S. 1147 (2006). The 2013 challenge to the State's protocol using compounded pentobarbital took four times as long, lasting 645 days in the trial court, which included an appeal of a discovery dispute.[6] *See West v. Schofield*, 519 S.W.3d 550 (Tenn. 2017), *cert. denied sub nom. West v. Parker*, 138 S. Ct. 476 (2017), *cert. denied sub nom. Abdur'Rahman v. Parker*, 138 S. Ct. 647 (2018), *reh'g denied*, 138 S. Ct. 1183 (2018).

The Petitioners, already shouldering the heavy burden imposed by *Glossip*, the cloak of secrecy surrounding executions, and the fast pace of the proceedings, were also impeded by the State's evasiveness about the availability of pentobarbital until the eve of trial and by its last minute decision to eliminate pentobarbital as an execution protocol. The parties took discovery depositions throughout June, with the Petitioners reasonably assuming that Protocol A (pentobarbital) was an available alternative execution method under *Glossip*. Just a few hours before the parties filed their trial briefs on July 5, 2018, the Department adopted a revised execution protocol that abandoned Protocol A, leaving only Protocol B. But the Department, according to testimony from its Commissioner, had known that pentobarbital was unavailable for executions for about two months before it retained pentobarbital as a lethal injection method in January 2018. Even so, the State failed to notify the Petitioners and failed to take a consistent position on the availability of pentobarbital until the eve of trial.

For example, at the first pretrial hearing on April 11, 2018, counsel for the State dodged the trial court's questions about the availability of pentobarbital. The trial court, acutely aware of the time constraints, zeroed in on the problem and repeatedly questioned counsel about the availability of pentobarbital. The trial court emphasized that the availability of Protocol A was "essential for the case," and if that question could not be

---

[5] In *Abdur'Rahman v. Bredesen*, the plaintiffs filed their petition on July 26, 2002, and the trial court issued its decision on June 2, 2003.

[6] In *West v. Schofield*, the plaintiffs filed their petition on November 20, 2013. The trial began on July 7, 2015, and the trial court issued its decision on August 26, 2015.

answered, the trial court proceedings would be "futile and useless," putting the court as well as the parties in an "untenable position." The State's response to the trial court's direct question – "will [Protocol A] be available for the August 9th execution?" – was "I can't answer that question, Your Honor." The trial court then correctly observed that "if you can't answer [that question] then our proceedings here are really meaningless" and that it created a "Catch 22" dilemma for the court and the litigants.

The Department's Commissioner testified on June 5, 2018, that the Department would "search out all options to obtain pentobarbital," but the Department's records tell a different story. Those records show that the Department's designated drug procurer only looked for pentobarbital over a four-month period from March 2017 through July 2017. There appears to have been no activity after July 2017 until June 20, 2018, when the drug procurer emailed a potential supplier, stating that the Department was "still searching for USP grade pentobarbital" and "circling back around with folks" to check on availability for purchase. That said, Texas officials used pentobarbital on July 17, 2018, to execute Christopher Young; on June 27, 2018, to execute Danny Bible; on May 16, 2018, to execute Juan Castillo; on April 25, 2018, to execute Erick Daniel Davila; on March 27, 2018, to execute Rosendo Rodriguez III; on February 1, 2018, to execute John David Battaglia; on January 30, 2018, to execute William Rayford; and on January 18, 2018, to execute Anthony Shore.[7] And in Georgia, officials used pentobarbital to execute Carlton Michael Gary on March 15, 2018, and Robert Butts, Jr., on May 4, 2018.[8] Most recently, pentobarbital was used in Texas on September 26, 2018, to execute Troy Clark; and on September 27, 2018, to execute Daniel Acker.[9]

The State's retention of pentobarbital as an execution protocol until July 5, 2018, and its refusal to take a firm position on the availability of pentobarbital for Irick's August execution refutes the State's argument that the Petitioners had actual notice as early as February 2018 that pentobarbital was not available. Petitioners could have reasonably inferred the availability of pentobarbital from the Department's adoption of it in January 2018, the Department's retention of it until July 5, 2018, *and* the State's representations in the trial court.

As the trial court accurately observed, the availability of pentobarbital was essential to the case, and without the State answering the question as to the availability of pentobarbital, the trial court proceedings were meaningless. For the State to provide the answer on the eve of trial while effectively evading the question for months was patently unfair to the Petitioners.

---

[7] Death Penalty Information Center (DPIC), *Execution List 2018*, https://deathpenaltyinfo.org/execution-list-2018.

[8] *Id.*

[9] *Id.*

5

For all these reasons, the Petitioners were denied due process in the form of a fundamentally fair process. "At its core, the right to due process reflects a fundamental value in our American constitutional system." *Boddie v. Connecticut*, 401 U.S. 371, 374 (1971). An essential requirement of due process is notice and an opportunity to be heard. *Phillips v. State Bd. of Regents*, 863 S.W.2d 45, 50 (Tenn. 1993) (citations omitted). The purpose of notice is to give the affected party the opportunity to marshal its proof. *Id.* (citation omitted). "'Due process is flexible and calls for such procedural protections as the particular situation demands.'" *Id.* (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). The factors we consider in determining whether a party has been deprived of due process are 1) the private interest affected; 2) the risk that the procedures in place would erroneously deprive the affected party of that private interest; and 3) the government's interest, including any fiscal or administrative burdens that would be caused by additional or substitute procedural requirements. *Id.*

There could hardly be a more substantial private interest at stake than making sure that the Petitioners are not made to suffer intolerable pain when the State puts them to death and that their federal and state constitutional rights to be free from cruel and unusual punishment are protected. Resetting the scheduled execution dates would have gone a long way in giving the Petitioners a fair and meaningful opportunity to be heard and would not have placed any appreciable fiscal or administrative burdens on the State.

In the end, the difficulties of meeting the inconsistent and unworkable *Glossip* requirements and the cloak of secrecy surrounding Tennessee executions; the extraordinary and unnecessary time constraints imposed by the Court due to the impending, and seemingly unalterable, execution dates; and the State's evasiveness about its execution method and its last-minute changes to the lethal injection protocols combined to deny the Petitioners due process in the form of a fundamentally fair process.

## II.

This is the Court's first opportunity to review a trial court decision on the constitutionality of the midazolam-based protocol. The Petitioners, faced with the prospect of suffering needlessly while being put to death by the State, deserve meaningful appellate review of the trial court's ruling. Meaningful review includes giving counsel adequate time to review trial testimony, research and brief the issues, and effectively advocate for their clients in their appellate briefs and at oral argument. Only then can the Court, after reviewing the record from the trial court, reading the parties' briefs, listening to the oral arguments, and studying applicable legal authorities, render its decision. The Court should not make its decision in haste, but after thoughtful and careful deliberation. The parties and the public deserve no less. Here, the super-expedited schedule imposed by the Court denied the Petitioners meaningful appellate review.

To begin with, the Court unreasonably reduced the time for the Petitioners to file the record with the appellate court clerk from a minimum of 105 days (or more if an objection to the record is filed or if the record needs to be supplemented) to nine days (seven days excluding a weekend). This was rather extraordinary given that the trial lasted ten days, with twenty-three witnesses testifying and 139 exhibits admitted into evidence. The record filed with the appellate court clerk consisted of twenty-nine volumes of court filings, thirty-two volumes of trial transcripts, and nineteen volumes of trial exhibits, totaling well over 10,000 pages. In reducing the Petitioners' time for filing the record, the Court failed to consider that filing the record is a three-part process, involving the parties, the trial court clerk, and the trial court judge.[10] The trial court had no opportunity to review and approve the record, and the parties had no chance to point out any errors in the record. Not surprisingly, the record—prepared in great haste—is not completely accurate. The Lead Petitioners[11] noted that their counsel "corrected apparent transcription errors," but that they did "not have the physical ability to correct all of the errors in this record prior to September 6, 2018." Likewise, the Miller Petitioners pointed to specific "transcription errors [that] change[d] the substance of testimony."[12]

Next, the Court cut in half the parties' briefing period from seventy-four days to thirty-seven days (twenty-six days, excluding weekends and Labor Day). *Abdur'Rahman v. Parker*, No. M2018-01385-SC-RDO-CV (Tenn. Aug 13, 2018) (Lee, J., dissenting). The Lead Petitioners had only fifteen days to review the record and to prepare and file their brief, while the Miller Petitioners had just ten days to review the record and to prepare and file their brief and the State had fifteen days to brief the case. *Abdur'Rahman v. Parker*, No. M2018-01385-SC-RDO-CV (Tenn. Aug 27, 2018) (Lee, J., dissenting).

The detrimental effects of the limited briefing schedule are evident from the parties' briefs. The Miller Petitioners admitted in their brief that they did not have time to brief fully the trial court's errors:

---

[10] *See Abdur'Rahman v. Parker*, No. M2018-01385-SC-RDO-CV (Tenn. Aug 13, 2018) (Lee., J., dissenting) (reviewing the time frames afforded each participant to fulfill their role, including sixty days for the Petitioners to file a certified transcript of the proceedings with the trial court clerk, forty-five days for the trial court clerk to assemble and transmit the record to the appellate court clerk after the filing of the transcript; and approval of the transcripts and exhibits by the trial court judge within thirty days after the expiration of the time for filing objections).

[11] "Lead Petitioners" refers to the twenty-nine original petitioners who filed a Notice of Appeal in the Court of Appeals on July 30, 2018. "Miller Petitioners" refers to the four remaining petitioners, David Earl Miller, Nicholas Todd Sutton, Stephen Michael West, and Larry McKay, who filed a Notice of Appeal in the Court of Appeals and in this Court on August 23, 2018.

[12] For instance, on page three of their brief, the Miller Petitioners called the Court's attention to an error in Volume XLII, page 1795 of the transcripts of proceedings ("It was a very firm decision that because there was no memory created does [sic- doesn't] mean that the suffering was not occurring.").

7

Due to the "compressed super-expedited" briefing schedule, the Miller Plaintiffs primarily raise in this brief due process violations because those errors undermine the integrity of the entire proceeding below. Undersigned counsel acknowledges the rule on waiver that usually applies when an issue is not fully briefed on appeal, however, *counsel does not have the time or resources to brief all significant errors which occurred in the proceedings below and are reflected in the Chancery Court's final order.*

(Emphasis added). The Miller Petitioners also noted in their reply brief that it was "prepared under an extreme time limitation and likely contains errors," and that it lacked an introduction, all relevant facts, legal authority, record cites and an exhaustive analysis. Predictably, given the time constraints, the Lead Petitioners had to late-file their brief's table of authorities. The State even had to file a substitute brief to correct erroneous page references in the table of contents, in the table of authorities, and in its response to the issues raised by the Miller Petitioners, as well as citation errors.

Previous appeals of constitutional challenges to the State's lethal injection protocols have not been rushed or decided hastily. This case was pending only fifty-six days from the time the Court reached down and assumed jurisdiction on August 13, 2018, until it released its opinion today. Yet the appeal of the 2002 challenge to the State's protocol using sodium pentothal, pancuronium bromide, and potassium chloride was pending in this Court for 231 days.[13] *See Abdur'Rahman v. Bredesen*, 181 S.W.3d 292 (Tenn. 2005), *cert. denied*, 547 U.S. 1147 (2006). The appeal of the 2013 challenge to the State's protocol using compounded pentobarbital lasted 391 days in this Court.[14] *See West v. Schofield*, 519 S.W.3d 550 (Tenn. 2017), *cert. denied sub nom. West v. Parker*, 138 S. Ct. 476 (2017), *cert. denied sub nom. Abdur'Rahman v. Parker*, 138 S. Ct. 647 (2018), *reh'g denied*, 138 S. Ct. 1183 (2018).

The Court does not cure the unfairness of this super-expedited appeal by allowing the Lead Petitioners to file a brief with an argument section that exceeded the fifty-page limit in Tennessee Rule of Appellate Procedure 27 and by granting both parties fifteen more minutes for oral argument.

Given the gravity of the issues in this appeal, the extensive record, and the required legal analysis, the Court's accelerated schedule deprived the Petitioners of meaningful appellate review. This mad dash to the finish line was unnecessary. Nothing

---

[13] In *Abdur'Rahman v. Bredesen*, this Court granted the plaintiff's application for permission to appeal on February 28, 2005, and filed its opinion on October 17, 2005.

[14] In *West v. Schofield*, this Court granted the State's motion to assume jurisdiction on March 2, 2016, and filed its opinion on March 28, 2017.

8

prevented the Court from giving the Petitioners, who are facing possible torture during their upcoming executions, appellate review that is fair and meaningful.

III.

Because these proceedings have not been fundamentally fair to the Petitioners, I dissent.

SHARON G. LEE, JUSTICE

9