RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0009p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

DONALD RAY MIDDLEBROOKS,

  *Plaintiff-Appellant*,

  *v.*

TONY PARKER, in his official capacity as Tennessee's Commissioner of Correction; TONY MAYS, in his official capacity as Warden of Riverbend Maximum Security Institution,

  *Defendants-Appellees*.

┐
│
│
│
│  No. 20-5419
│
│
│
│
┘

─────────────────

On Petition for Rehearing En Banc

United States District Court for the Middle District of Tennessee at Nashville.
No. 3:19-cv-01139—William Lynn Campbell, Jr., District Judge.

Decided and Filed: January 13, 2022

Before: MOORE, CLAY, and WHITE, Circuit Judges.

─────────────────

**COUNSEL**

**ON PETITION FOR REHEARING EN BANC:** Miranda Jones Scott Sutherland, Rob Mitchell, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON RESPONSE:** Richard Lewis Tennent, Kelley J. Henry, Amy D. Harwell, Katherine Dix, Marshall Jensen, OFFICE OF THE FEDERAL PUBLIC DEFENDER FOR THE MIDDLE DISTRICT OF TENNESSEE, Nashville, Tennessee, for Appellant. **ON AMICUS BRIEF:** Jeffrey C. Mando, Claire E. Parsons, ADAMS LAW, PLLC, Covington, Kentucky, D. Barry Stilz, KINKEAD & STILZ, Lexington, Kentucky, for Amicus Curiae.

  MOORE, CLAY, and WHITE, JJ., the original panel of the court, issued an order denying the petition for rehearing en banc and a statement in support. THAPAR, J. (pp. 4–14), issued a separate statement respecting the denial of rehearing en banc.

_____

**ORDER**

_____

The court received a petition for rehearing en banc. The original panel has reviewed the petition for rehearing and concludes that the issues raised in the petition were fully considered upon the original submission and decision of the case. The petition then was circulated to the full court. No judge has requested a vote on the suggestion for rehearing en banc.

Therefore, the petition is denied.

---

**STATEMENT IN SUPPORT**

---

MOORE, CLAY, and WHITE, Circuit Judges.

The panel offers three observations in support of the denial of the petition for rehearing en banc.

First, as the Order denying en banc review makes clear, "*no judge*" of this court "requested a vote on the suggestion for rehearing en banc."  Order at 2 (emphasis added).

Second, the panel's opinion simply applied binding Supreme Court precedent to reverse the district court's dismissal of Middlebrooks's facial challenge and remanded the case to the district court for further proceedings.  *Middlebrooks v. Parker*, 15 F.4th 784, 797 (6th Cir. 2021).

Third, Judge Thapar's statement does not suggest that the panel improperly applied any Supreme Court or Sixth Circuit precedent.  (Perhaps that is why he did not request a vote on the suggestion for rehearing en banc.)  Instead, with a string of citations to Supreme Court concurrences, dissents, and one decades-old dissent from denial of certiorari, the statement makes a series of normative claims about how death-penalty doctrine should operate, and coaches states as to how they may use their sovereign authority to proceed with executions more efficiently.

———————————

**STATEMENT**

———————————

THAPAR, Circuit Judge, statement respecting denial of rehearing en banc.

Thirty-two years after he brutally tortured and killed a 14-year-old boy, Donald Middlebrooks asks this court to bar his execution by lethal injection as cruel and unusual punishment. He says that Tennessee's midazolam protocol will inflict unnecessary pain and violate the Eighth Amendment. So he demands that the State use pentobarbital instead. But just eight years ago, Middlebrooks raised precisely the same objection to pentobarbital. What changed? Tennessee can no longer access pentobarbital.

Such gamesmanship is far from unusual in capital-punishment litigation. So in a pair of cases, *Baze v. Rees* and *Glossip v. Gross*, the Supreme Court aimed to curb the prolonged litigation that surrounds method-of-execution claims. Unfortunately, things haven't panned out this way in the lower courts. This case is proof positive. And the fact that our jurisprudence turns on fact-specific inquiries rather than bright-line rules ensures that the deck remains stacked against the states. Why? Because even when the state wins in the first round of litigation, a determined inmate can demand a rematch by pointing to "new facts." And unsurprisingly, "new facts" are not hard to come by at the pleading stage. What's more, these allegations earn the inmate a ticket to the costly and time-consuming discovery that picks apart every aspect of the state's execution method. Thus, for those inmates who see litigation as only a device of delay, our jurisprudence invites such maneuvers.

Like many death-row inmates, Middlebrooks has made a career out of exploiting these gaps. Kerrick Majors's family and the legal system both deserve better.

I.

Kerrick Majors was no different from most 14-year-olds. He liked to hang out with his friends and have some fun. One day, Kerrick and four of his friends went to a flea market. They saw Donald Middlebrooks, his wife Tammy, and the couple's friend, Roger Brewington, setting

up a table. The five boys started looking through the things Middlebrooks had set on the table. But Middlebrooks's wife yelled at the boys, "Hey y'all n------, leave our stuff alone." So they took off running—but Middlebrooks and Brewington followed them. Four of the boys got away. Sadly, Kerrick did not. Middlebrooks and Brewington caught him and dragged him back to the table.

When they caught him, they grabbed him in a "sleeper hold" around his neck. Kerrick cried out, asking them to let him go and protesting that they all knew each other. But one just responded: "F--k you n-----." Kerrick was black; Middlebrooks and Brewington are white. (One witness testified that Middlebrooks claimed to be a member of the KKK, "hated n------," and had punched a black man for just saying hello.)

Next, Middlebrooks punched Kerrick in the face and knocked him down. Together with his wife and Brewington, he then dragged Kerrick into the woods. There, they beat him with brass knuckles and a switch, struck him in the testicles, urinated in his mouth, burned his face with a cigarette lighter, forced a stick into his anus, and slashed open his wrist with a knife. They carved an "X" into his chest. After three and a half hours of torture, Kerrick was still conscious and begging for his life. But his crying and pleading began to get on Middlebrooks's nerves. So the men stabbed him to death.

Indeed, as he later confessed, Middlebrooks inflicted the final wounds that extinguished Kerrick's life. Why? So he could "prove" to Brewington that he was "cooler."

The next day, police discovered Kerrick's mangled, naked body lying face up in a dry creek bed under a foam mattress. A bloodstained and urine-soaked T-shirt was tied around his neck. Bruises, swelling, and abrasions disfigured his face. Forensic examiners confirmed that Kerrick suffered unimaginable horrors: One of the stab wounds had penetrated his left lung and pulmonary artery, meaning that Kerrick likely bled to death over a period of ten to thirty minutes after staying conscious through the hours before.

Middlebrooks gave a lengthy video-taped confession about the murder and presented no proof at trial. A jury sentenced him to death because the killing was "especially heinous, atrocious, or cruel."

Since a jury of his peers convicted him of murder and recommended the death penalty in 1989, Middlebrooks has been no stranger to the courtroom.  Indeed, he has spent thirty-two years attempting to unwind his sentence by litigating up, down and across the federal and state court systems.[1]

Middlebrooks now claims that there is a substantial risk that Tennessee's three-drug protocol of midazolam, vecuronium bromide, and potassium chloride (the "midazolam protocol") will cause him to suffer severe pain in violation of the Eighth Amendment.  Instead, he proposes that the State use either nitrogen hypoxia or pentobarbital.[2]

The irony?  In an earlier case, Middlebrooks argued that pentobarbital posed "a substantial risk of a lingering death." *See West v. Schofield*, 519 S.W.3d 550, 552 (Tenn. 2017).  Now he claims pentobarbital "will greatly reduce the substantial risk of severe pain."  R. 13, Pg. ID 187–88.  One might wonder if this litigation is about pain at all or simply delay.  After decades of litigation, the answer seems self-evident.

## II.

Turning to Middlebrooks's legal claim, he faces a high hurdle.  Though methods of execution have changed over time, the Supreme Court "has never invalidated a State's chosen procedure for carrying out a sentence of death as the infliction of cruel and unusual punishment."

---

[1]A string cite can sometimes be worth a thousand words.  Here, it at least gives the reader a glimpse into Middlebrooks's never-ending journey across our justice system.  Indeed, his challenges have outlasted the entire careers of judges, prosecutors, and politicians. *See State v. Middlebrooks*, 840 S.W.2d 317 (Tenn. 1992) (direct appeal), *cert. dismissed*, 510 U.S. 124 (1993) (mem.); *State v. Middlebrooks*, 995 S.W.2d 550 (Tenn. 1999) (direct appeal after resentencing); *Middlebrooks v. State*, No. M2001-01865-CCA-R3-PD, 2003 WL 61244 (Tenn. Crim. App. Jan. 9, 2003) (appeal from the denial of state petition for post-conviction relief); *Middlebrooks v. Bell*, No. 3:03-0814, 2007 WL 760441 (M.D. Tenn. Mar. 8, 2007) (federal petition for habeas corpus), *aff'd*, 619 F.3d 526 (6th Cir. 2010), *rev'd sub nom. Middlebrooks v. Colson*, 566 U.S. 902 (2012) (mem.); *Middlebrooks v. Colson*, No. 3:03–00814, 2014 WL 3817238 (M.D. Tenn. Aug. 1, 2014) (decision on remand), *aff'd on other grounds sub nom. Middlebrooks v. Carpenter*, 843 F.3d 1127 (6th Cir. 2016), *cert. denied*, 138 S. Ct. 503 (2017) (mem.), *reh'g denied*, 138 S. Ct. 1046 (2018) (mem.); *West v. Schofield*, 468 S.W.3d 482 (Tenn. 2015) (state court challenge to Tennessee's designation of electrocution as alternative method of execution); *West v. Schofield*, 519 S.W.3d 550 (Tenn.) (state court challenge to Tennessee's lethal-injection protocol using pentobarbital), *cert. denied*, 138 S. Ct. 476 (2017) (mem.); *Abdur'Rahman v. Parker*, 558 S.W.3d 606 (Tenn. 2018) (state court challenge to Tennessee's three-drug protocol for lethal-injection), *cert. denied*, 139 S. Ct. 1533 (2019) (mem.).

[2]As the panel held that res judicata barred his as-applied nitrogen hypoxia claim, pentobarbital remains Middlebrooks's only claim on remand.

*Glossip v. Gross*, 576 U.S. 863, 869 (2015) (citation omitted).  To succeed, Middlebrooks must show that the State's chosen method of execution "cruelly superadds pain."  *Bucklew v. Precythe*, 139 S. Ct. 1112, 1125 (2019) (citing *Glossip*, 576 U.S. at 869–78, and *Baze v. Rees*, 553 U.S. 35, 52 (2008) (plurality opinion)).  And he must show that a "feasible and readily implemented alternative method of execution" exists that substantially reduces the risk of severe pain and that "the State has refused to adopt without a legitimate penological reason."  *Id.*

Middlebrooks is well-acquainted with the *Baze-Glossip* test.  After all, this is at least his third challenge to Tennessee's execution protocol.  And when these challenges are viewed side-by-side with how the State's execution protocol has changed over time, it is hard to shake the impression that Middlebrooks is playing a contrived game of "Whac-A-Mole."

Start with Middlebrooks's first method-of-execution challenge in 2014.  At that time, Tennessee used pentobarbital for its executions.  Middlebrooks, along with a group of other inmates, challenged the State's use of pentobarbital as posing a "substantial risk of a lingering death" that violated the Eighth Amendment's prohibition on cruel and unusual punishment.  *See Schofield*, 519 S.W.3d at 552.  This challenge failed because the plaintiffs failed to both show pentobarbital caused severe pain and identify a readily available alternative.  *Id.* at 564–66.

But soon after this three-and-a-half-year suit ended, Tennessee had to change its execution protocol despite its courtroom victory.  Why?  Because anti-death penalty advocates had successfully lobbied one manufacturer to stop selling the drug to any state using it for executions.  *Glossip*, 576 U.S. at 871.  And the rest had followed suit.  So Tennessee turned to the midazolam protocol it retains to this day.

With pentobarbital unavailable, Middlebrooks changed his tune.  In his next method-of-execution challenge, he and other inmates demanded that the State execute them with pentobarbital.  *Abdur'Rahman v. Parker*, 558 S.W.3d 606, 610 (Tenn. 2018).  But Middlebrooks's second suit failed too.  The inmates could not show that pentobarbital was available—let alone readily implementable.  *Id.* at 623, 625.  Indeed, all of the evidence showed the opposite.  As the state court aptly noted, "[c]ommon sense" tells us Tennessee would have

used pentobarbital if it could get it—the State had just spent over three years successfully defending its constitutionality. *Id.* at 624 n.21.

So now, Middlebrooks brings his third challenge: Yet another suit, this time in federal court. Again claiming pentobarbital as an alternative to the midazolam protocol. And he sidesteps res judicata by alleging "new facts" that *this time* pentobarbital really is a readily available alternative to the midazolam protocol.

A.

Take a step back and this suit raises two observations. First, it's hard not to see all this for what it is. A transparent act of gamesmanship that seeks only one thing: Delay for delay's sake. Second, it makes one wonder whether our method-of-execution jurisprudence is well-suited for the practicalities of capital punishment litigation. To be sure, sincere litigants exist who sue only to vindicate their constitutional rights. But the Supreme Court has warned us time after time to watch for the inmate who looks to "use such challenges as tools to interpose unjustified delay." *Bucklew*, 139 S. Ct. at 1134.

And it now appears that the *Baze-Glossip* test is especially vulnerable to such gamesmanship. As I understand the test, we must engage in a comparative enterprise that pits the state's designated method of execution against a method of execution chosen by the plaintiff (irrespective of whether it's authorized under state law). *See id.* at 1127–29. Yet an inmate intent on dragging out litigation for the sake of delay has every incentive to identify only a method of execution on the boundary of what's practically available to the state—like asking for pentobarbital once a state concludes the drug is beyond its reach. This alone can trigger years of litigation about "[w]hich alternative procedures are 'feasible' and 'readily implemented'" or when a reduction in risk is sufficiently significant. *Baze*, 553 U.S. at 105 (Thomas, J., concurring in judgment). And what's more, as this case shows, an inmate is not necessarily restricted to one bite at the apple. Instead, he can simply restart the game time after time by pointing out that "new facts" have emerged. Such a scheme makes a mockery of our criminal justice system.

To the extent our analysis must be a comparative exercise, I would propose that a more workable approach would compare the state's preferred method of execution with "traditional modes of execution such as hanging and the firing squad." *Id.* at 106. After all, if we know that such methods are constitutionally valid, then shouldn't the state's preferred method of lethal injection also pass muster if it is less likely to cause the inmate substantial pain? *See, e.g.*, *In re Kemmler*, 136 U.S. 436 (1890) (upholding electrocution); *Wilkerson v. Utah*, 99 U.S. 130, 134–135 (1879) (upholding the firing squad). And once the Supreme Court blesses a method of execution in one case, then that method should be permissible as a categorical matter for any state to use.[3]

Until we change our jurisprudence, significant delays will remain par for the course in capital punishment cases. And the results speak for themselves. In 1960, "the average delay between sentencing and execution was two years." *Glossip*, 576 U.S. at 925 (Breyer, J., dissenting). By 2014, "the average had risen to about 18 years." *Id.* Today, the number is surely higher. Unsurprisingly, more death-row inmates in Tennessee have died of natural causes than by execution in the last 20 years. *Compare* Appellant Br. at 38, *with State & Fed. Info: Tennessee*, Death Penalty Info. Ctr. (Jan. 6, 2022).

This trend only amplifies Chief Justice Rehnquist's forty-year-old observation that "endlessly drawn out legal proceedings" have whittled the death penalty down to "virtually an illusion." *Coleman v. Balkcom*, 451 U.S. 949, 958 (1981) (Rehnquist, J., dissenting from denial of certiorari). In 1999, 98 executions took place across the Nation. *See The Death Penalty in 1999: Year End Report*, Death Penalty Info. Ctr. (Dec. 1, 1999). Last year, 11. *See* Michael Tarm, *Report: 11 Executions in 2021 Mark Three-Decade Low*, Associated Press (Dec. 16, 2021).

The Constitution has almost nothing to do with this drop. Nor does the ballot box. Instead, the death penalty's death-by-a-thousand-cuts—through a distortion of the Eighth Amendment—has come mostly at the hands of the federal judges who have overseen "the

---

[3]Indeed, under this test, this case would have been easy. Since the Supreme Court has already blessed this protocol in *Glossip*, Tennessee would have swiftly won on the merits. No costly litigation to re-decide what has already been decided. Yet here we are.

proliferation of labyrinthine restrictions on capital punishment." *Glossip*, 576 U.S. at 898 (Scalia, J., concurring).

And sharp costs accrue with this exercise in raw judicial power.

Start with the victims' families. As the Supreme Court recently explained, "the victims of crime have an important interest in the timely enforcement of a [death] sentence," which is undercut by decades of litigation-driven delay. *Bucklew*, 139 S. Ct. at 1133 (citation omitted). Indeed, "finality acquires an added moral dimension . . . when lengthy federal proceedings have run their course." *Calderon v. Thompson*, 523 U.S. 538, 556 (1998). And only real finality can allow victims of crime to "move forward knowing the moral judgment will be carried out." *Id.*

As one can only expect, Kerrick's murder has irrevocably upended his family's lives. One state court found, "[s]ince his murder, his mother's health has deteriorated. She has been on medication and will not leave the house except for doctor appointments." *State v. Middlebrooks,* 995 S.W.2d 550, 554 (Tenn. 1999). Kerrick's mother suffered a nervous breakdown and repeatedly has panic attacks. *Id.* She has been unable to sleep at night since his murder. And Kerrick's brother suffered from mood swings after blaming himself for his brother's murder. *Id.* As this ordeal enters its fourth decade, we must not forget that every delay delivers a fresh denial of closure to Kerrick's family.

But decades of litigation also bring other less visible costs. Long delays congest the courts. And despite their lack of a constitutional foundation, the delays likely also deter states from pursuing the death penalty in the first place. *See Glossip*, 576 U.S. at 898 (Scalia, J., concurring) (noting that the death penalty's stringent procedural costs have contributed to the abolition of the punishment in several states). All in all, the near-total erasure of the death penalty undercuts core principles of democratic governance.

As Chief Justice Rehnquist put it, "[w]hen society promises to punish by death certain conduct, and then the courts fail to do so, the courts not only lessen the deterrent effect of the threat of capital punishment, they undermine the integrity of the entire criminal justice system." *Coleman*, 451 U.S. at 959 (Rehnquist, J., dissenting from denial of certiorari). Federalism and comity are other predictable casualties when federal judges are the ones effectively nullifying a

state's death penalty scheme. *Cf. Harrington v. Richter*, 562 U.S. 86, 103 (2011) (noting that federal habeas "disturbs the State's significant interest in repose for concluded litigation, denies society the right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority" (citation omitted)). That may be appropriate when the Constitution demands it. But our death penalty jurisprudence falls far afield from the Constitution.

Last, but not least, these delays also take a toll on death-row inmates. Though it is often of their own making, many inmates live out their entire lives in prison with the sword of capital punishment dangling above them. One need not be a psychiatrist to understand the peculiar costs of this arrangement. *See Glossip*, 576 U.S. at 925–27 (Breyer, J., dissenting). In sum, intractable and prolonged litigation should be in nobody's interest.

B.

While I may not have decided the res judicata point the same way as the panel, the district court can promptly resolve this case on remand. Binding precedent from both our en banc court and the Supreme Court renders this case a straightforward one on the merits. In *In re Ohio Execution Protocol*, we rejected a near-identical challenge to the one here. 860 F.3d 881 (6th Cir. 2017) (en banc). Like Tennessee, Ohio had switched out pentobarbital for a midazolam protocol after "opponents of the death penalty successfully pressured the pharmaceutical companies" to cut off its pentobarbital supply. *Id.* at 884. And like Middlebrooks, the Ohio inmates proposed pentobarbital as their alternative method of execution. *Id.* at 890.

In rejecting that challenge, we endorsed two conclusions that should swiftly resolve this case.

*First*, the test for "readily available" requires Middlebrooks to show more than a mere "possibility that [Tennessee] can obtain the active ingredient of pentobarbital." *Id.* (cleaned up). He bears the burden to prove that Tennessee can obtain the drug with "ordinary transactional effort" here and now. *Id.* at 891. Indeed, "the inmate's proposal must be sufficiently detailed to permit a finding that the State could carry it out relatively easily and reasonably quickly." *Bucklew*, 139 S. Ct. at 1129 (cleaned up). For that reason, it's not enough for Middlebrooks to

merely allege that "new facts" show Tennessee could receive an import license from the Drug Enforcement Administration. Indeed, it wouldn't even be enough if Tennessee had a pending application with the DEA. After all, in our en banc case, Ohio had applied for such a license. And we noted that because "Ohio [did] not know whether the DEA will approve its application, or even when that decision might be made," pentobarbital wasn't readily available. *In re Ohio Execution Protocol*, 860 F.3d at 890–91.

*Second*, without more, pentobarbital's continued availability in other jurisdictions is immaterial. In *In re Ohio Execution Protocol*, we knew that seven other states possessed pentobarbital. *Id.* at 891. But each of those states refused to share their limited supply with Ohio. And that was enough to close the matter. An alternative drug that no one is willing to supply Tennessee "is no drug at all for [*Baze-Glossip*] purposes." *Chavez v. Fla. SP Warden*, 742 F.3d 1267, 1275 (11th Cir. 2014) (E. Carnes, C.J., concurring).

C.

Two last points.

A casual reader of today's case might wonder why Middlebrooks isn't estopped from making such polar-opposite arguments. Perhaps he should be, but the State didn't raise this argument either before the panel or now. In future cases, states might consider arguing that judicial estoppel bars inmates from making inconsistent claims in order to delay proceedings. Rooted in equity, the rule of judicial estoppel "prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citing 18 James Wm. Moore et al., *Moore's Federal Practice* § 134.30, p. 134–62 (3d ed. 2000)). And it may prove a useful tool for identifying inmates who are more interested in delaying their executions than in avoiding unnecessary pain. *See Bucklew*, 139 S. Ct. at 1129.

Though judicial estoppel resists efforts to reduce it "to any general formulation of principle," three factors "typically inform the decision whether to apply the doctrine": (1) the "later position must be 'clearly inconsistent'" with the earlier one; (2) the court must accept the litigant's earlier position, so adopting the later position would be inconsistent; and (3) the party

seeking to change its position "would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire*, 532 U.S. at 750–51 (citation omitted).

To be sure, Middlebrooks never convinced the state courts that pentobarbital violated the Constitution. But judicial estoppel's equitable roots mean these factors are not "inflexible prerequisites or an exhaustive formula" for determining the doctrine's limits. *Id.* at 751. Instead, we apply the doctrine with the understanding that its purpose is "to protect the integrity of the judicial process." *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598 (6th Cir. 1982). In other words, judicial estoppel aims to stop parties from "playing fast and loose with the courts." 18B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4477.2 (2d ed., Supp. 2021) (cleaned up). And for the reasons I discuss above, a case like this one might comfortably fit within the doctrine's elastic scope. After all, Middlebrooks's gamesmanship evinces an utter disregard for our "entire criminal justice system." *Coleman*, 451 U.S. at 959 (Rehnquist, J., dissenting from denial of certiorari).

And relatedly, the way an inmate pleads his method-of-execution challenge can have important procedural implications. Suppose Middlebrooks—knowing he had previously challenged pentobarbital—had identified only nitrogen hypoxia as an alternative. Nitrogen hypoxia isn't authorized under Tennessee law. In such a case, his action should sound in habeas rather than § 1983. Why? Because, as the Eleventh Circuit has persuasively explained, his requested relief in such a case would "necessarily imply the invalidity of his death sentence"— that is, allowing execution only by nitrogen hypoxia would effectively preclude the State from enforcing his sentence. *Nance v. Comm'r, Ga. Dep't of Corr.*, 981 F.3d 1201, 1203 (11th Cir. 2020); *cf. Nelson v. Campbell*, 541 U.S. 637, 644 (2004); *Hill v. McDonough*, 547 U.S. 573, 579 (2006); *Bucklew*, 139 S. Ct. at 1128. And if that's right, then it follows that such a suit is cognizable only under habeas. *See Edwards v. Balisok*, 520 U.S. 641, 643 (1997) ("[A] state prisoner's claim for damages is not cognizable under 42 U.S.C. § 1983 if 'a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence.'" (quoting *Heck v. Humphrey*, 512 U.S. 477, 487 (1994))).

I recognize that our caselaw may not currently support placing these challenges exclusively in the habeas bucket. *See In re Campbell*, 874 F.3d 454, 465–66 (6th Cir. 2017).

But our precedent on the question predates *Bucklew*. Since *Bucklew* updated our method-of-execution jurisprudence, we should revisit our caselaw when the appropriate vehicle arrives.

\*\*\*

The Constitution does not promise inmates "a painless death." *Bucklew*, 139 S. Ct. at 1124. It forbids only cruel and unusual methods of punishment. And that is a high bar. Indeed, Justice Story believed the Eighth Amendment would be "unnecessary" as no "free government" would permit the sort of punishments the amendment prohibits. 3 Joseph L. Story, *Commentaries on the Constitution of the United States* § 1896, p. 750 (1833).

The states have kept their end of the bargain. Tennessee, like many of its sister states, adopted lethal injection aiming to minimize the risk of pain. *See Bucklew*, 139 S. Ct. at 1124–25. But these good intentions have not gone unpunished. Instead, states have been greeted with a flood of method-of-execution challenges.

This case is a poster child of death penalty litigation at its worst. Middlebrooks has been challenging his sentence in one form or another for thirty-two years—more than twice the time Kerrick ever got to enjoy on Earth. *Cf. Davis v. Ayala*, 576 U.S. 257, 290 (2015) (Thomas, J., concurring).

At some point, enough is enough.

ENTERED BY ORDER OF THE COURT

_____
Deborah S. Hunt, Clerk